IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                      Case No. 10-10140-01-JTM

CARLIS D. ROGERS AND JACQUES D. DUBOSE,

    Defendants.

MEMORANDUM AND ORDER

Presently before this court is the government's Motion to Consume Physical Evidence in Furtherance of the Investigation (Dkt. No. 22). The court held a hearing on November 3, 2010, in which it ruled from the bench. For the reasons detailed on the record and summarized below, the court grants the motion. The government may consume the entire sample only to the extent necessary to obtain a useful DNA profile. If consumption of the entire sample is not necessary, the government must preserve the remaining sample and make it available to the defendant for testing.[1]

**I. Factual Background**

The following facts were taken primarily from the government's motion (Dkt. No. 22). On September 10, 2010, at around 9:43 a.m., three black males, two of whom used guns, robbed Legacy Bank on north Woodlawn, in Wichita Kansas. This robbery was similar to several recent robberies

---

[1]For the purposes of this Order, the court uses the word "defendant" to refer to Carlis D. Rogers and not Jacques Dubose.

in the area. Police immediately broadcast the robbery over police dispatch. Soon thereafter, the Wichita Police Department, Sedgwick County Sheriffs Office and the FBI responded to Jacques Dubose's home—one of the suspects—who lived at 1557 N. Kenmar in Wichita. Lieutenant McLaurian was the first to respond. Once there, he witnessed a white Ford Expedition parked in front of Dubose's home that appeared to be running. A few minutes later, he saw two black males carrying backpacks cross the street from the east toward Dubose's home. The two men placed the backpacks in the Expedition and went inside the house. Several minutes later, a black male walked out of the house and got in the driver's seat of a red Chevy Avalanche parked in the driveway. A second black male got into the passenger seat. Eventually, the car backed out of the driveway and drove west on 14th St. After the driver failed to signal at two intersections, McLaurian initiated a traffic stop. The driver was Jacques Dubose and the passenger was Carlis Rogers. The tag on the car had been altered, and Dubose was arrested. The Wichita police arrived and learned there was a warrant out on Rogers, and he was arrested. As an officer removed Rogers from the car, the officer saw a wadded up shirt that partially concealed a semi-automatic handgun and a wad of cash in Roger's lap.[2] The same day, September 10, the police executed a search warrant on the Avalanche and found a handgun, a loaded magazine, and $4,055 in cash. Eight of the bills matched bills stolen from Legacy Bank. The officers also searched Dubose's home and found $4,699 in cash. Eleven bills matched those stolen from Legacy Bank.

Later the same day, Kevin Harrison, who lives across the street from Dubose, went to the police and told them that on September 9, Dubose had asked Harrison if he could stay at his house on September 10. Harrison agreed and left his door unlocked so Dubose could enter the house.

---

[2] The defendant disputes whether the wadded up shirt with the gun and money was found on his lap.

Harrison played golf with his father on September 10, and was not home while Dubose was there. Harrison allowed a search of his home but the officers found nothing. On September 13, Harrison contacted the police to inform them of the "full" story of what had happened. Harrison said that when he returned home after his golf game he found a black trash bag containing several hooded sweatshirts, a bank bag, two bank trays, and a nylon bag that matched the description of a bag taken from the bank during the robbery. He then searched the rest of his house and found two guns that did not belong to him. He hid the bag and the guns before the officers searched his home on September 10. One of the guns was a Smith and Wesson .44 magnum and the other was a Tec .22 that was missing the magazine. A Tec .22 magazine was found outside Legacy Bank on the day of the robbery.

On September 14, Dubose confessed to the robbery but would not identify the other participants. He also admitted using Harrison's house to divide the money and to hide the guns and clothing. Surfaces of all the guns and clothing were swabbed for future DNA analysis and comparison. The swabs were sent to the Sedgwick County Regional Forensic Science Center (Center). Dr. Shelly Steadman, a forensic scientist at the Center, notified the government that the DNA swabs from the guns might be so small that the lab would need to consume (that is, destroy the physical properties of the DNA swab) the entire sample in order to best perform analysis. She also said there was additional potential for mixed or multiple contributors, which would increase the need to consume the whole sample. She requested the government seek permission of the court before continuing with the testing.

At the hearing, Dr. Steadman reaffirmed and elaborated her early statements to the government. She described the process she takes when analyzing a DNA sample as it relates to the

issue of consumption. First, she testified that it is generally protocol for the Center to either get permission from the detective, prosecutor, or sometimes even the court before testing a sample. Next, she takes the DNA swabs (which are generally taken shortly after the item is seized) and uses those swabs to extract a liquid DNA sample. At that point, she performs a quantitative analysis on the sample to estimate how much DNA is present in the liquid extract. However, the amount of DNA in a given extract does not always correlate with the ability to create a useful DNA profile. A small DNA extract may yield a highly discriminatory DNA profile and a large DNA extract may not provide a useful DNA profile. The quantitative analysis only provides an estimate on the amount of DNA present, not the quality of the profile. There is no way to discern the quality of the sample until after she performs the test. If the liquid DNA sample is large enough, she may decide that it is not necessary to consume the entire sample. But, she stated that she frequently must consume the entire sample and that complete consumption provides the best chance of creating a useful DNA profile. Dr. Steadman specifically testified that consumption of the entire sample is appropriate in most cases because the DNA present in the sample is often limited in nature; therefore, consumption provides the greatest opportunity of generating a discriminating profile that can either exclude the defendant or match the defendant's DNA with that found on the evidence. Dr. Steadman also testified that dividing the sample is an option. However, she stated that dividing the sample decreases the possibility of generating a useful DNA profile. Dividing a sample also creates a transfer loss, that is, losing a greater percentage of the sample than would otherwise occur from a single undivided sample. Last, dividing a sample creates another opportunity for contamination of the sample.

The government argues that it should be allowed to consume the entire sample in order to get a more useful DNA profile. Defendant argues that the government should not be allowed to

consume the entire sample because to do so would violate the defendant's due process rights. In the alternative, defendant argues that the court should either order the government to split the sample so both parties can conduct independent tests or allow the defendant's expert to observe the government's scientist as she conducts the test. The issue for this court becomes, whether defendant's due process rights will be violated if the government consumes the entire sample.

**II. Legal Standard and Analysis**

"The principles articulated in *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988), regarding the Due Process Clause and the government's destruction or loss of evidence prior to a criminal trial guide our analysis." *United States v. Bohl*, 25 F.3d 904, 909 (10th Cir. 1994). Each case articulates a different standard. Under *Trombetta*, "evidence must both (1) possess an exculpatory value that was apparent before the evidence was destroyed, and (2) be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489 (alterations added). A court should only use this standard when the evidence possesses exculpatory value that was apparent before it was destroyed. *Id.* Under the *Youngblood* standard, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially useful evidence* does not constitute a denial of due process of law." 488 U.S. at 58 (emphasis added). A court should use this standard when the evidence possesses potentially exculpatory evidence. *Id.* Potentially exculpatory evidence is evidence that could be subjected to testing, the results of which might exonerate the defendant. *Id.* at 57.

First, a court should analyze the evidence and determine whether to apply *Trombetta* or *Youngblood*. *Bohl*, 25 F.3d at 910. Defendant argues that:

> [T]he defense reasonably believes the evidence from the DNA swabs will be favorable to him. It is worth noting that two of the three firearms, which were allegedly brandished at the scene of the crime, were recovered from a third party's residence. Additionally, the Government has not disclosed the presence of any fingerprint evidence recovered from the firearms that might link them to Mr. Rogers.

The defendant has not shown that the evidence has apparent exculpatory value. Defendant argues only that he "reasonably believes" the evidence will be favorable to him, not that it will exonerate him. The fact that two of the guns were found at a third party's home does not give the evidence apparent exculpatory value. Also, simply because the government has not linked the defendant to the guns by fingerprint is not really relevant to what DNA testing might show and does not mean the evidence will be exculpatory. More importantly, the evidence obtained from the guns or clothing is not exculpatory because no matter the result it will not prove the defendant was or was not involved in the robbery. Because the evidence does not have apparent exculpatory value, the court must determine if the evidence is potentially exculpatory under *Youngblood*. *See Bohl*, 25 F.3d at 910.

The court finds that defendant's arguments more reasonably show that the evidence is potentially exculpatory.[3] At this stage, the government has not tested the DNA, and neither party knows what the results will show. The best the defendant can show is that if the evidence is tested, it might exonerate him; thus, under *Youngblood*, defendant must also establish that if the government consumes all the DNA evidence it would constitute bad faith. *See* 488 U.S. at 58. When determining bad faith courts looks at the following factors:

> (1) whether the government had explicit notice that [defendant] believed the [evidence] was exculpatory; (2) whether the claim that the evidence is potentially exculpatory is conclusory, or instead "backed up with objective, independent

---

[3] It is not obvious that the evidence is even potentially exculpatory because, even if the tests are inconclusive or negative, that does not necessarily mean defendant did not participate in the robbery or use one of the guns. Nevertheless, it is fair to characterize the evidence as "potentially exculpatory."

6

evidence giving the government reason to believe that further tests of the [destroyed evidence] might lead to exculpatory evidence"; (3) whether the government could control the disposition of the evidence once [defendant] indicated that it might be exculpatory; (4) whether the evidence was central to the case; and (5) whether the government offers any innocent explanation for its disposal of the evidence.

*United States v. Smith*, 534 F.3d 1211, 1224-25 (10th Cir. 2008) (alterations added). First, the government does have explicit notice that the defendant believes the DNA swabs will be favorable to him. That the evidence will be exculpatory, as discussed above, is not an issue because the test results will not, on its own, prove that the defendant was or was not involved in the robbery. The second factor weighs in favor of the government for similar reasons and for the reasons that follow. Defendant only claims that he "reasonably believes" the evidence will be favorable and argues that because two guns were found in a third party's house, the evidence is likely to be exculpatory. While this is not a conclusory argument, it is not enough to give the government reason to believe further tests by the defendant would uncover exculpatory evidence. Additionally, the government has circumstantial evidence that defendant was involved in the robbery. Lieutenant McLaurian saw two black men walk from across the street with backpacks (possibly from Harrison's house) into Dubose's house. Dubose and defendant then walked out of Dubose's house and got into the Chevy Avalanche, which McLaurian stopped shortly thereafter. When defendant was arrested, he had a gun and money wrapped up in a shirt on his lap or near his body. Eight of the bills matched those stolen from Legacy Bank. There is no objective, independent evidence that indicates further testing would lead to potentially exculpatory evidence.

Factors 3-5 weigh in favor of the government to the extent it is possible to evaluate those factors before consumption. The government currently controls the disposition of the evidence and has decided to wait for this court's order before testing the DNA sample. This on its own indicates

7

the government's good faith attempt to refrain from consuming the evidence in violation of the defendant's due process rights. Factor 4 is neutral because the value of the evidence will not be determined until after the testing. Additionally, whether the defendant held the gun or not is not really central to the case because that fact alone does not connect or disconnect him to the robbery. Further, the possible result could be only partially discriminating and, thus, not beneficial to either party. Factor five is not directly applicable because the government has not yet disposed of the evidence. But, the government does offer an innocent explanation for its request to consume the entire sample. The government argues that it seeks to consume all the evidence because that is the only way sufficiently to test the sample, it does not seek to consume the evidence for the purpose of thwarting defendant's ability to test the DNA. Dr. Steadman bolstered the credibility of this argument when she testified that obtaining a useful DNA profile often requires complete consumption. Testing this type of sample is a one shot deal because there is no way to increase the sample and retest it. Thus, although the evidence has not been destroyed, the government does offer an innocent explanation for seeking to consume the entire sample; thus, this factor weighs in favor of the government. After evaluating these factors, this court finds that each favor's the government and collectively show a lack of bad faith.

The Third Circuit's opinion in *United States v. Stevens*, 935 F.2d 1380 (3d Cir. 1991) is also helpful. In *Stevens*, the government and the defendant agreed that the government would not destroy saliva samples during testing so the defendant could also test the samples. *Id.* at 1387. However, when the government gave the sample to the defendant there was not enough left to test sufficiently. *Id.* In evaluating bad faith, the Third Circuit, adopting the ruling of the district court, held the defendant failed to show bad faith because "the fact that there was [an] insufficient sample, the fact

that [the] sample did not yield of definate [sic] conclusions, I think does not bespeak of bad faith. It just indicates that unfortunately, there wasn't a sufficient sample and quality to arrive at a determination." *Id.* at 1387-88.

Similarly, the government here is trying to make a good faith attempt not to destroy the evidence if it would violate the defendant's due process rights. The fact that the evidence may be insufficient to support DNA testing by both sides is unfortunate, but it does not constitute bad faith. The defendant seeks to have the government preserve the evidence before its exculpatory value is known. This is not possible. And, as the *Youngblood* Court stated, "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." 488 U.S. at 56, n. (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Because the government cannot know the exculpatory value of the evidence before it is tested, consuming all the evidence, if necessary to create a useful DNA profile, cannot constitute bad faith.

The defendant's alternative arguments—that the government should split the sample or allow the defendant's expert to oversee the testing—are not necessary to preserve the defendant's due process rights. In order to get a reliable test, Dr. Steadman testified she likely will need to consume the entire sample. If the court accepts defendant's argument of splitting the sample, it is likely neither sample would be sufficient to generate a useful DNA profile. However, if it is possible to split the sample and not compromise the reliability of the testing, the government must split the sample and provide the defendant with a sample so he can conduct an independent test if he wishes. The court also finds that it is unnecessary for defendant's expert to be present during the testing because it would not materially aid the defendant in challenging the reliability of the test. Defendant retains the

9

ability to challenge the testing procedures by cross examining the government's expert or by impeaching the reliability of her methods. *See Trombetta*, 467 U.S. at 489-90 (providing that both methods are sufficient to protect defendant's due process rights).

IT IS ACCORDINGLY ORDERED this 3rd day of December, 2010, that the government's Motion to Consume Physical Evidence in Furtherance of the Investigation (Dkt. No. 22) is granted. IT IS FURTHER ORDERED that if the government can obtain a valid DNA profile without consuming all the DNA, it is required to preserve the rest of the sample so the defendant may test it if he wishes to do so.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE