IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                              Case No. 10-10140-JTM

CARLIS D. ROGERS, ET. AL.,

    Defendants.

MEMORANDUM AND ORDER

This matter arises on several motions filed by the defendant, Carlis Rogers. Defendant has filed the following motions: Motion to Exclude *Bruton* Evidence (Dkt. No. 35); Motion for Pretrial "*James*" Hearing (Dkt. No. 36); Motion for Separate Trial Pursuant to Rules 12(b)(3) and 14 (Dkt. No. 37); Motion in Limine for Criminal Record and Other Prior Crimes (Dkt. No. 38); Motion in Limine for DNA Evidence and Testimony on DNA Evidence (Dkt. No. 39); Motion in Limine for Other Bank Robberies and Related Activity (Dkt. No. 40); Motion for Production of Prior Bank Robbery Investigation Information (Dkt. No. 41); Motion to Produce DNA Evidence (Dkt. No. 43); and Motion to Suppress Evidence (Dkt. No. 46). The court held a hearing on February 14, 2011, in which it ruled from the bench. For the following reasons, and those stated on the record, the court denies the defendant's motions.

On March 18, 2011, defendant Rogers pleaded guilty to being a felon in possession of a firearm, so the court is filing this Order as a means of completing the record.

## I. Factual Background

On September 10, 2010, at around 9:43 a.m., Legacy Bank on north Woodlawn, in Wichita, Kansas, was robbed by two armed African American males and a third who was unarmed. This robbery was similar to several recent robberies in the area. Within minutes, several law enforcement officers from the Wichita Police Department (WPD), Sedgwick County Sheriff's Office (SCSO), and the FBI responded to locations around Wichita believed to be associated with the previous bank robbery suspects, one of which was Jacques Dubose's home at 1557 N. Kenmar. Lieutenant Jay McLaurian of the SCSO arrived first at around 10:06 a.m. He saw a white Ford Expedition parked in the front of the house with the interior dome lights and running board lights on. It appeared to McLaurian that someone had just left the car or that someone would soon be returning. He then drove to the end of the block to watch the house. About fifteen minutes later, he saw two African American males cross the street and walk toward the Expedition. It appeared to him that they placed backpacks in the car, then walked into Dubose's house. Several minutes later, two African American males left the house and got into a red Chevrolet Avalanche parked in Dubose's driveway. About a minute later, a third African American male approached and began talking to the two men. He then walked away from the car back toward the house as the Avalanche backed out of the driveway and headed south on Kenmar. As the car passed McLaurian, he recognized the driver as Dubose.

Around that time, WPD Officer Palmer arrived in the area and began following the Avalanche. While following from two or three blocks away, he observed the driver fail to signal two turns; the first at 14th and Belmont and the second at 13th and Belmont. Officer Bachman also testified that the car failed to signal at 13th and Belmont. Prior to the traffic stop, Officer Palmer also noticed what he believed was an altered registration decal on the license plate of the Avalanche.

Based on the two failures to signal, Officer Palmer stopped the vehicle around 13th and Bluff. Officer Bachman, Officer West, and Detective Geddis arrived on the scene at that time. Upon inspection of the tag and after running the plates, Officer Palmer discovered the tag had been altered, and he arrested Dubose. Officer Bachman and Detective Geddis approached the passenger side of the car, and the passenger identified himself as Carlis Rogers. Each officer saw a wadded up shirt or rag in Rogers's lap and an envelope. Knowing that Rogers was a suspect in several armed bank robberies, that some of the robberies involved violence, and that a similar robbery had just occurred, Officer Bachman asked Rogers to get out of the car and patted him down. Officer Bachman then directed Officer West to search the wadded up shirt or rag in the passenger seat. Officer West placed his hand on the clothing and felt a hard object, then proceeded to lift up the bundle of clothes Rogers had placed on the seat. Underneath the clothing he saw a gun and wads of cash. At that point, Officer Bachman ordered the search to cease until they could get a search warrant and placed Rogers under arrest. After running a check on Rogers, the officers also discovered he had an outstanding warrant for failure to pay child support. During the stop, Rogers made an unsolicited statement that the money was his and it was related to the sale of his sister's car.

The same day, WPD Detective Alexander sought and obtained a search warrant for the vehicle, which was executed later in the day. Among the items seized were, a loaded silver and black Taurus .40 caliber handgun, a loaded magazine, $4,055.00, and six rolls of quarters. Eight of the bills, all found in the passenger seat, matched the pre-recorded bait bills from Legacy Bank.

Also, on September 10, Kevin Harrison, who lives across the street from Dubose, went to law enforcement and told them that Dubose had asked him on September 9, if he could stay at his house on Friday. Harrison agreed and left his door unlocked so Dubose could enter the house.

3

Harrison played golf with his father on September 10, and was not home. Harrison allowed a search of his home, but the officers found nothing. On September 13, Harrison contacted law enforcement to inform them of the "full" story of what had happened. Harrison said that when he returned home after his golf game he found a black trash bag containing several hooded sweatshirts, a bank bag, two bank trays, and a nylon bag that matched the description of a bag taken from the bank during the robbery. He then searched the rest of his house and found two guns that did not belong to him. He hid the bag and the guns before the officers searched his home on September 10. One of the guns was a Smith and Wesson .44 magnum and the other was a Tec .22 that was missing the magazine. A Tec .22 magazine was found outside Legacy Bank on the day of the robbery.

On September 14, 2010, FBI Special Agent Little and Detective Alexander interviewed Dubose. During the interview he confessed to being the September 10, Legacy Bank robber wearing the yellow hooded sweatshirt and brandishing the .44 magnum. He also said he was the driver of the blue car as it left the bank and told the officers he had driven his Expedition to a location near the bank so they could switch from the blue car to the Expedition. Further, he stated they used Kevin Harrison's house to divide the money, change clothes, and hide evidence. He stated he robbed the bank because he was in debt and needed to pay bills. He did not implicate the other two persons involved in the robbery.

Surfaces of all the guns and clothing were swabbed for future DNA analysis and comparison. The swabs were sent to the Sedgwick County Regional Forensic Science Center. Dr. Shelly Steadman, a forensic scientist from the Center notified the government that the DNA swabs might be so small the lab would need to consume the entire sample in order to best perform an analysis. She also said there was additional potential for mixed or multiple contributors which would increase

4

the need to consume the whole sample. She requested the government seek permission of the court before continuing with the testing. On November 3, 2010, the court granted permission to continue the testing and to consume the sample if necessary. (Dkt. No. 34). Dr. Steadman testified that testing these samples was more time consuming than the "routine case" due to the numerous items tested, the several individual profiles involved, and the number of multiple contributors in each sample. She summarized the preliminary results in an email sent to Assistant U.S. Attorney Matt Treaster on November 23, 2010. At that point, there were still more tests to run and her work needed to be peer reviewed within the office before it was completed. After completing the tests, she sent them to the government on January 19 or 20, and the government provided the reports to the defense the same day.

## II. Analysis

*A. Motion to Exclude Bruton Evidence (Dkt. No. 35) and Motion for Separate Trial Pursuant to Rules 12(b)(3) and 14 (Dkt. No. 37)*

Because Dubose has indicated he intends to enter a guilty plea, the defendant's motions for a separate trial and to exclude *Bruton* evidence are denied as moot. *See* Dkt. No. 68, para. 1.

*B. Motion for Pretrial "James" Hearing (Dkt. No. 36)*

Defendant Rogers moves the court to hold a pretrial hearing pursuant to *United States v. James*, 590 F.2d 575, 579-80 (5th Cir. 1979), to determine the admissibility of coconspirator statements. The government opposes such a hearing and sets forth a written proffer of statements to determine the admissibility of statements in lieu of a *James* hearing. The government requests that the court rule on the admissibility of the statements by provisionally admitting them subject to the

actual testimony at trial. While a defendant has no right to a *James* hearing, the Tenth Circuit has expressed a preference for *James* hearings in this situation. *Compare United States v. Hernandez*, 829 F.2d 988, 994 (10th Cir. 1987), *with United States v. Gonzalez-Montoya*, 161 F.3d 643, 649 (10th Cir. 1998). "Before making a final ruling on the admissibility of such statements, a district court may proceed in one of two ways: (1) hold a *James* hearing outside the presence of the jury or (2) provisionally admit the evidence but require the Government to connect the statements to the conspiracy during trial." *United States v. Cornelio-Legarda*, 381 Fed. App'x 835, 845 (10th Cir. 2010). In making a provisional ruling as to whether a conspiracy exists, the court may consider the government's proffered statement, along with any other independent evidence. *United States v. Pricebrooks*, No. 10-20076-03, 2010 WL 5104837, at *1 (D. Kan. Dec. 2, 2010).

Coconspirator statements may be admitted if: "(1) a conspiracy existed; (2) both the declarant and the defendant against whom the declaration is offered were members of the conspiracy; and (3) the statements were made in the course of and in furtherance of the conspiracy." *United States v. Campbell*, Nos. 07-10142-01 to 20, 2009 WL 464570, at *1 (D. Kan. Feb. 20, 2009) (citing *United States v. Ramirez*, 479 F.3d 1229, 1248, n.11 (10th Cir. 2007)). The party offering the evidence must prove these facts by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 176 (1987). "[A] court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted. *Id.* at 181. The court has discretion to consider any non-privileged evidence, including both the challenged coconspirator statements and any hearsay evidence, regardless of its admissibility at trial when determining whether the government met its burden. *See United States v. Owens*, 70 F.3d 1118, 1124 (10th Cir. 1995).

Under the first element, establishing a conspiracy, the government must show: "(1) two or more persons agreed to violate the law; (2) the defendant knew the essential objectives of the conspiracy; (3) the defendant knowingly and voluntarily participated in the conspiracy; and (4) the alleged coconspirators were interdependent." *Campbell*, 2009 WL 464570, at *1 (citing *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006)).

Next, the court must determine whether the declarant and the defendant were members of the conspiracy. "The connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." *United States v. Tranakos*, 911 F.2d 1422, 1430 (10th Cir. 1990) (citations omitted). A defendant who acts in furtherance of the object of the conspiracy is presumed to be a knowing participant. *Id.* The determination may also be based on circumstantial evidence. *Id.*

The last element requires the statements be made in the course of and in furtherance of the conspiracy. The focus is on whether the declarant's intent in making the statement was to advance the conspiracy, not whether it did so. *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993). Statements that in any way promote the objectives of the conspiracy meet this element. *United States v. Peveto*, 881 F.2d 844, 852 (10th Cir. 1989). There is no requirement that the statement be made by one coconspirator to another. *United States v. Williamson*, 53 F.3d 1500, 1519 (10th Cir. 1995).

The defendant's motion for a *James* hearing is denied. The government has provided substantial discovery in this case. A *James* hearing would only further duplicate evidence at trial and evidence previously presented to this court. A *James* hearing would also waste judicial resources and those of counsel, with little gain. Additionally, in light Dubose's decision to plead guilty, it will be easier to conditionally admit the evidence at trial, and the defendant will suffer no prejudice.

Therefore, the court will conditionally admit the statements subject to the government connecting them to the conspiracy during trial.

*C. Motion in Limine for Criminal Record and Other Prior Crimes (Dkt. No. 38)*

Defendant moves the court for an order prohibiting the government from presenting evidence about Rogers's criminal record and other prior crimes. He argues his past criminal convictions are unrelated to the current charges and would prejudice him, confuse the issues, or mislead the jury in violation of Fed. R. Evid. 403. The government has stated it does not plan to introduce evidence of past crimes except for the present charges and that Rogers is a previously convicted felon, which is an element of Count IV.

Under Fed. R. Evid. 404(b): "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The Tenth Circuit has adopted a four-part test to determine whether to admit 404(b) evidence, which requires:

> (1) the evidence was offered for a proper purpose under Fed. R. Evid. 404(b); (2) the evidence was relevant under Fed. R. Evid. 401; (3) the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice under Fed. R. Evid. 403; and (4) the district court, upon request, instructed the jury to consider the evidence only for the purpose for which it was admitted.

*Wilson*, 107 F.3d at 782 (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)). The Supreme Court's decision in *Old Chief v. United States* is also helpful. In *Old Chief*, the Court held evidence of a prior conviction may not be admitted against a defendant if the defendant has offered to stipulate to the prior conviction. 519 U.S. 172, 189-192 (1997).

8

Here, the defendant has not offered to stipulate to the prior conviction, thus, the court must analyze the four factors above.[1] The element of a prior felony conviction is at issue and the government must prove it beyond a reasonable doubt. The evidence is not being offered to prove character, and it is relevant to the current charge of being a felon in possession of a firearm. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2) (2000 & Supp. 2010). And, the probative value of such evidence is not outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury. Without allowing this evidence, the government would have no opportunity to prove this element. So long as the government puts on minimal evidence necessary to prove the prior conviction it will be admitted for the limited purpose of proving the element of a prior conviction. *See United States v. Miller*, 985 F. Supp. 1284, 1286-87 (D. Kan. 1997) (holding that in the absence of a stipulation, admitting evidence of a prior conviction did not unfairly prejudice the defendant and was properly admitted).

*D. Motion in Limine for DNA Evidence and Testimony on DNA Evidence (Dkt. No. 39)*

Defendant requests the court prohibit the government from presenting any testimony relating to DNA evidence because he has not received the results from the government, and the government has not designated an expert witness who will discuss the evidence. Although the government did not provide defense counsel the DNA testing results within the time stated in the discovery order, it had good cause for not complying with the order. Dr. Steadman testified that the number of items to be tested, the number of individual profiles, and the occurrence of multiple contributors in the

---

[1] Fed. R. Evid. 609 does not control the admissibility of a conviction when the fact of conviction is an element of the offense. *See United States v. Soria*, 965 F.2d 436, 442 n.4 (7th Cir. 1992).

samples required a longer testing period. She also testified this was not a "routine case" in which testing could be completed in six to eight weeks. This court has no reason to doubt the credibility of her testimony. The five-day delay did not prejudice the defendant; therefore, the motion is denied.

*E. Motion in Limine for Other Bank Robberies and Related Activity (Dkt. No. 40)*

Defendant requests the court to prohibit the government from introducing evidence that he and Dubose, along with others, were suspected of committing prior bank robberies that occurred in Wichita in order to explain why law enforcement went to Dubose's house after the Legacy Bank robbery. Defendant argues the probative value of such evidence would be substantially outweighed by the danger of unfair prejudice. The government asserts it only wants to use the evidence to explain why the government investigation was underway, a purpose explicitly approved by the Tenth Circuit. *United States v. Wilson*, 107 F.3d 774, 780 (10th Cir. 1997) (stating "'out of court statements are not hearsay when offered for the limited purpose of explaining why a Government investigation was undertaken'") (quoting *United States v. Freeman*, 816 F.2d 558, 563 (10th Cir. 1987)). Such a purpose is not hearsay because it is not being introduced to prove the defendants were involved in prior bank robberies, but merely to explain why the government was investigating the defendants. Here, Detective Alexander's testimony concerning information gained from confidential sources is not being offered for the truth of the matter asserted; rather, it is being offered to explain why the government began its investigation of Rogers and Dubose. *See Freeman*, 816 F.2d at 563. This information is relevant to provide background for the law enforcement officer's testimony, and the probative value of such evidence is not substantially outweighed by the danger of unfair prejudice. *See Wilson*, 107 F.3d at 781. Thus, the defendant's motion is denied.

*F. Motion for Production of Prior Bank Robbery Investigation Information (Dkt. No. 41)*

Defendant moves the court to require the government to produce "any and all records regarding any investigations by law enforcement authorities involving Defendant, co-defendant Jacques Dubose, or any of their alleged associates in any bank robberies or other monitored activities prior to September 10, 2010, including but not limited to field notes, recordings, printed summaries, and any other information relied upon by law enforcement in originally suspecting the defendants in this matter." (Dkt. No. 41).

The government responded by saying it does plan to introduce the testimony of Detective Alexander who will testify that Rogers and Dubose were suspects in other armed robberies prior to the Legacy Bank robbery on September 10, 2010. Lt. McLaurian, who conducted surveillance of the two defendants shortly after the robbery of Legacy Bank, is also expected to testify that they were suspects of other armed robberies and that after the robbery he went to Dubose's house. The government has produced certain police reports to the defense but objects to producing further background information about why the defendants were suspects. The government argues this would require it to divulge its investigative techniques and the identity of confidential informants and tipsters during an ongoing investigation.

Fed. R. Crim. P. 16(a)(1)(E)(i) provides:

> **(E) Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
> (i) the item is material to preparing the defense;
> (ii) the government intends to use the item in its case-in-chief at trial; or
> (iii) the item was obtained from or belongs to the defendant.

"'Due to the strong public interest in furthering effective law enforcement, the government enjoys a privilege to withhold from disclosure the identity of persons who furnish law enforcement officers with information on criminal acts.'" *United States v. Vincent*, 611 F.3d 1246, 1251 (10th Cir. 2010) (quoting *United States v. Mendoza-Salgado*, 964 F.2d 993, 1000 (10th Cir. 1992)). "The privilege must give way, however, when 'the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause.'" *Vincent*, 611 F.3d at 1251 (quoting *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957)). The necessity of disclosure depends on the circumstances of each case, including the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. *Id.* The defendant has the burden of demonstrating a need for discovery. *Id.*

Here, the defendant has not met his burden. Defendant has not showed why he needs this information in relation to the crimes charged, possible defenses, or the significance of the information. The charges stem from the robbery of Legacy Bank, not any information received from an informant about prior robberies. Additionally, the government does not plan to call any confidential informants to testify. The only information the government expects to use from the confidential informants relates to why law enforcement went to Dubose's house after the robbery. Because defendant has not shown why he needs this information, the public interest in protecting the flow of information requires nondisclosure. Thus, defendant's motion is denied.

*G. Motion to Produce DNA Evidence (Dkt. No. 43)*

In this motion, defendant requests the court to require the government to produce any and all records regarding DNA analysis of evidence, including but not limited to test results, reports,

analysis notes, and expert conclusions. On January 10, 2011, the government filed a notice with this court stating it would be unable to provide a summary of the DNA test results by January 15, as provided in the General Order of Discovery and Scheduling. The government had contacted Dr. Steadman, and she stated she would be unable to complete the testing by that date. The government did state it could provide the test results by January 21, and did so on January 20, along with the expert's *curriculum vitae*. Therefore, the motion is denied as moot.

*H. Motion to Suppress Evidence (Dkt. No. 46)*

In this motion, defendant seeks to suppress evidence seized during the detention of defendant and the subsequent search of the car in which he was a passenger as violative of the Fourth Amendment. He also moves to suppress any statements or admissions made by him or Dubose during the traffic stop and subsequent police interviews.

1. The Traffic Stop

Officer Palmer's decision to stop the Chevy Avalanche and detain Dubose and Rogers constitutes a seizure under the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Thus, the stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). A traffic stop is reasonable at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that "'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" *United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir. 1999) (quoting *United States v. Botero-Ospina*, 71 F.3d

783, 787 (10th Cir.1995)). The officer's subjective motivations for making the stop are irrelevant as long as reasonable suspicion of a traffic violation exists. *United States v. Burkley*, 513 F.3d 1183, 1186 (10th Cir. 2008).

Under Kansas law, "[n]o person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety, nor without giving an appropriate signal in the manner hereinafter provided." KAN. STAT. ANN. § 8-1548(a) (2010). Kansas courts have also held that a person who commits a traffic violation may be stopped and detained by a law enforcement officer. *See State v. Schmitter*, 23 Kan. App.2d. 547, 551, 933 P.2d 762, 767 (1997) ("Our courts have consistently held that an officer who observes a traffic violation has the right to stop the offending vehicle and briefly detain its occupants for the purpose of enforcing the traffic laws of this state.").

Here, Officer Palmer saw the failure to signal at 14th and Belmont and again at 13th and Belmont, each from two or three blocks away. Officer Bachman also observed the second failure to signal from no more than a half a block away. Defendant argues the distance between the vehicles calls the stop into question. He also argues that on the second violation, the officers' cars and the Avalanche were in such differing positions from each other it is highly probable the officers were unable to see a turn signal violation when the Avalanche turned right from a southbound road to a westbound one. The court fails to see how the positioning of the cars prevented the officers from observing whether or not the Avalanche used its signal given the uncontradicted testimony at the hearing. The court finds these traffic violations provided probable cause for the stop. *See United States v. Gregoire*, 425 F.3d 872, 876-79 (10th Cir. 2005).

2. Detention and Search

Next, defendant argues that his detention after the stop, and subsequent search of the clothes laying on the passenger seat of the vehicle, violated the Fourth Amendment. As a general rule, once an officer's purpose in a traffic stop based on probable cause or reasonable suspicion has ended, he must let the person go. *Ozbirn*, 189 F.3d at 1199. However, an officer may continue to detain the person if he has probable cause, consent, or at least reasonable suspicion of criminal activity. *Id*.

The government advances two arguments in support of the detention and search. First, it argues the officers were justified in making a protective search of the clothes in the passenger seat because they reasonably believed Rogers was dangerous and could gain access to a weapon. In *Michigan v. Long*, the Supreme Court held "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." 463 U.S. 1032, 1049 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "'[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id.* at 1050 (quoting *Terry*, 392 U.S. at 27). "To determine whether the officers possessed a reasonable suspicion that defendant might be armed and dangerous, the court must review the totality of the circumstances." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Reasonable suspicion may be based on information that is different in quantity or content and less reliable than that necessary to establish probable cause. *United States v. Hauk*, 412 F.3d 1179, 1186 (10th Cir. 2005). The Tenth Circuit has also acknowledged the danger inherent in vehicle stops:

> An officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped. Every traffic stop, after all, is a confrontation. The motorist must suspend his or her plans and anticipates receiving a fine or perhaps even a jail term. That expectation becomes even more real when the motorist or a passenger knows there are outstanding arrest warrants or current criminal activity that may be discovered during the course of the stop.

*United States v. Dennison*, 410 F.3d 1203, 1210-11 (10th Cir. 2005) (quoting *United States v. Holt*, 264 F.3d 1215, 1223 (10th Cir. 2001) (en banc). The fact that there is more than one occupant in the vehicle increases the possible risk of harm to the officer. *Id.* at 1211.

Here, the officers knew (1) Rogers was a suspect in several armed bank robberies, (2) that some of the robberies involved violence, and (3) that a similar bank robbery had just occurred. Armed with that information, the officers had reasonable suspicion to believe Rogers was dangerous and could gain immediate control of weapons; thereby justifying the protective search of the clothing laying on the seat. *See Long*, 463 U.S. at 1049-50; *see also United States v. Ridley*, 1998 WL 778381, at *2-4 (10th Cir. 1998) (holding the search of defendant's vehicle, which matched the description of a vehicle used in an armed robbery two days earlier, supported the officers' reasonable suspicion to search the vehicle for weapons). Therefore, the officer's protective search of uncovering the clothing laying on the seat was based on reasonable suspicion and did not violate the Fourth Amendment.[2]

---

[2]As an additional matter, the officers had probable cause to detain codefendant Dubose after discovering the registration decal on his licence plate had been altered. Officer Palmer believed someone had put an altered 2011 decal on the license plate. When he ran the plate, he found the tag had expired in April 2010. The display of an altered registration decal is an unclassified misdemeanor in Kansas. *See* KAN. STAT. ANN. § 8-142 *Second* (2010). An officer may arrest a person who is committing a crime in the officer's presence. KAN. STAT. ANN. § 22-2401(d) (2010). Because the officer discovered the altered license decal, and Dubose was the driver of the vehicle, his detention was proper.

Additionally, once Officer West found the gun and money in the pile of clothes, Officer Bachman stopped the search until they could obtain a search warrant. The rest of the vehicle was searched pursuant to a search warrant.

Second, the government argues the search of the passengers compartments of the vehicle was valid after they arrested Dubose for having an altered license decal. A search incident to arrest is valid "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Arizona v. Gant*, 129 S. Ct. 1710, 1719 (2009) (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in the judgment)). Often, when a recent occupant is arrested for a traffic violation, there is no reasonable basis to believe the vehicle contains relevant evidence. *See, e.g., Atwater v. City of Lago Vista*, 532 U.S. 318, 324 (2001) (arrested for failure to wear a seat belt); *Knowles v. Iowa*, 525 U.S. 113, 118-19 (1998) (arrested for speeding). Because the court finds the protective search was valid, it is unnecessary to address the government's second argument.

3. Suppression of Statements Made by Dubose and Rogers

Last, defendant "moves to suppress any statements or admissions of the Defendant and the co-defendant driver." (Dkt. No. 46, pg. 1). Dubose made statements to law enforcement during the stop and statements once he was taken into custody. Despite the government's argument to the contrary, Rogers does have standing to challenge the voluntariness of Dubose's statements. *See United States v. Dowell*, 430 F.3d 1100, 1107 (10th Cir. 2005) (stating that defendant is not seeking to vindicate the witnesses's Fifth Amendment rights, but is seeking to protect his own right to due process when challenging the voluntariness of a witness's statement). The question now becomes whether Dubose's statements were voluntary.

> A statement is involuntary if the government's conduct caused the witness' will to be overborne and his capacity for self-determination critically impaired. In determining whether a statement was freely and voluntarily given, the courts consider the totality of the circumstances. The relevant circumstances embrace both

17

the characteristics of the accused and the details of the interrogation. Relevant factors include the [witness's] age, intelligence, and education, the length of detention and questioning, the use or threat of physical punishment, whether *Miranda* warnings were given, the accused's physical and mental characteristics, the location of the interrogation, and the conduct of the police officers.

*Dowell*, 430 F.3d at 1107.

Here, neither side identifies particular statements made by Dubose at the traffic stop, and no facts suggest the statements at the traffic stop were involuntary. There are also no facts suggesting Dubose's statements to law enforcement after he was taken into custody were involuntary. Without facts showing the statements were involuntary, they will not be suppressed.

Rogers also moves to suppress the statements he made to law enforcement at the traffic stop and the background information he provided to law enforcement after he was arrested. During the stop, after the officers found money in the pile of clothes, Rogers stated "the money was from the sale of his sister's car and he was on his way to take the money and the car title to her." "The Fifth Amendment does not bar the admission of volunteered statements which are freely given." *United States v. Muniz*, 1 F.3d 1018, 1022 (10th Cir. 1993). Such volunteered statements do not invoke *Miranda's* protections. *Id.* Officer Palmer testified no officer elicited that response from Rogers. Because Rogers's statement to officers at the traffic stop was voluntary, it need not be suppressed.

Additionally, while Rogers was in custody, FBI Special Agent Entz and Detective Binkley asked Rogers a series of questions in order to fill out paperwork. They asked him his name, address, age, social security number, height, weight, tattoos, marital status, employment, education level, religious preference, prior military service, vehicle ownership, next of kin, children, medical history, current medication, arrest history, and recent sleep pattern. The Tenth Circuit has held that these types of questions related to booking does not constitute an interrogation for *Miranda* purposes.

*Clayton v. Gibson*, 199 F.3d 1162, 1172-73 (10th Cir. 1999). Because the line of questions asked by Entz and Binkley were routine booking questions, *Miranda* does not apply, and they will not be suppressed. After Rogers answered the above questions, he was read his *Miranda* rights and invoked them. His rights were honored, and the questioning ceased.

IT IS ACCORDINGLY ORDERED this 21st day of March 2011, that defendant's Motion to Exclude *Bruton* Evidence (Dkt. No. 35); Motion for Pretrial "*James*" Hearing (Dkt. No. 36); Motion for Separate Trial Pursuant to Rules 12(b)(3) and 14 (Dkt. No. 37); Motion in Limine for Criminal Record and Other Prior Crimes (Dkt. No. 38); Motion in Limine for DNA Evidence and Testimony on DNA Evidence (Dkt. No. 39); Motion in Limine for Other Bank Robberies and Related Activity (Dkt. No. 40); Motion for Production of Prior Bank Robbery Investigation Information (Dkt. No. 41); Motion to Produce DNA Evidence (Dkt. No. 43); and Motion to Suppress Evidence (Dkt. No. 46) are denied.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE